[Cite as *Dayton Children's Hosp. v. Garrett Day, L.L.C.*, 2019-Ohio-4875.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

DAYTON CHILDREN'S HOSPITAL, et al.

      Plaintiffs-Appellees/Cross-Appellants

v.

GARRETT DAY, LLC, et al.

      Defendants-Appellants/Cross-Appellees

:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 28047

Trial Court Case No. 2016-CV-2061

(Civil Appeal from
Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of November, 2019.

. . . . . . . . . . .

JEFFREY P. MCSHERRY, Atty. Reg. No. 0055993, 201 East Fifth Street, Suite 1110, Cincinnati, Ohio 45202
    and
BRYAN M. SMEENK, Atty. Reg. No. 0082393, 100 South Third Street, Columbus, Ohio 43215
    Attorneys for Plaintiffs-Appellees/Cross-Appellants


PAUL T. SABA, Atty. Reg. No. 0063723 and JEFFREY M. NYE, Atty. Reg. No. 0082247, 2623 Erie Avenue, Cincinnati, Ohio 45208
    Attorneys for Defendants-Appellants/Cross-Appellees

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} This case is before us on a Civ.R. 54(B) appeal and cross-appeal. The Appellants/Cross-Appellees are Garrett Day, LLC ("Garrett"), and Michael Heitz, who were Defendants and Third-Party Plaintiffs in the trial court. The Appellees/Cross-Appellants are Dayton Children's Hospital ("DCH") and Dayton-Montgomery County Port Authority, who were Plaintiffs in the trial court. Also part of the appeal is Appellee Deborah Feldman, who was joined as a Counterclaim Defendant in the trial court.[1]

{¶ 2} On appeal, Defendants contend that the trial court erred in granting summary judgment to DCH and Feldman on Defendants' claim of fraudulent inducement. This particular claim involves $40,000 held in escrow pending Defendants' completion of closing conditions regarding the sale of the former Dayton Electroplate property located at 1030 Valley Street in Dayton, Ohio, and a failure to sign a tax form that would have allowed Defendants to obtain a charitable deduction in connection with the sale of the property. In a single cross-assignment of error, DCH similarly contends that the trial court erred in granting summary judgment to Defendants regarding DCH's claim that Defendants fraudulently induced DCH into purchasing the former Dayton Electroplate property.

{¶ 3} We conclude that the trial court did not err in granting summary judgment on both sides' fraudulent inducement claims. These claims duplicated claims for breach of the parties' contract and were factually intertwined with the contract claims. In addition, the alleged damages of both sides are the same as those they claimed for breach of contract. Accordingly, the judgment of the trial court will be affirmed.

---

[1] For our convenience, we will refer to Garrett and Heitz collectively as "Defendants." We will also collectively refer to DCH, the Port Authority, and Feldman as "Plaintiffs."

## I. Facts and Course of Proceedings

{¶ 4} Due to the complexity of this case and the many individuals and companies involved, we will briefly describe these principal actors:

1. Garrett, which purchased the former Dayton Electroplate property ("the Property") at some time in 2012. Garrett is in the business of demolishing and remediating environmentally contaminated properties.

2. Michael Heitz, who owns 50% of Garrett and has been in the business of remediating properties since 1998.

3. Matt Wagner, who was an employee of KERAMIDA. Garrett employed KERAMIDA in connection with obtaining a grant from the Clean Ohio Assistance Fund ("Clean Ohio"). KERAMIDA also performed environmental assessment work at the Property after the grant was obtained. Wagner was employed at KERAMIDA from 2005 until April 2015, when he took a job with Tetra Tech. Wagner has worked on a number of projects with Garrett.

4. Shelley Dickstein, who was the assistant Dayton City Manager during the relevant time, and worked with Garrett, Heitz, and Wagner on the Clean Ohio project.

5. Keith Klein, who was a City of Dayton representative supervising the Clean Ohio grant.

6. Edd McGatha, who was the facilities director for DCH, which purchased the Property from Garrett.

7.    Deborah Feldman, who was the Chief Executive Officer of DCH.

8.    Steve Ireland, who was a realtor representing Garrett in the sale of the Property to DCH.

9.    MCM Demolition, which obtained a demolition permit in 2012 and demolished two buildings on the Property before Garrett and DCH signed a purchase agreement.

10.    Michael Cromartie, who was the Chief Building Official for the City of Dayton until April 2015.   The Chief Building Official is the department manager of the Division of Building Inspection, and manages the inspection group, which contains inspectors for several disciplines, including electrical, plumbing, structural, and HVAC.

11.    John Scott, who was the President of Bladecutters, Inc., a company that has been doing demolition work since 2007.   Bladecutters removed the concrete slab on the Property after the original purchase contact between Garrett and DCH was signed in July 2014.   At the time, Bladecutters' primary customer for demolition was the City of Dayton.

12.    Karen DeMasi, who was employed at CityWide Development ("CityWide"), and represented DCH in the negotiations over the Property. CityWide is a non-profit community economic development corporation. CityWide does comprehensive community development, real estate development, and business lending.

13.     Scott Adams, who replaced Michael Cromartie as Chief Building Official in April 2015.

14.	The Montgomery County Port Authority, which is a quasi-governmental agency located in CityWide's offices.   (According to the Port Authority's website, the Port Authority is a "political subdivision that is used as a vehicle to assist in the economic development process.   Port Authorities can loan or secure funds, receive grants and buy assets all in order to facilitate incentive drive financing transactions") (daytonport.com/about.html, accessed on October 26, 2019).

15.	The Dayton Reserves is a for-profit sub-company of CityWide.

16.	Michael Kerr, who was the owner of MAKSolve, LLC ("MAKSolve").   DCH retained MAKSolve to conduct environmental studies and to finish the removal of concrete from the Property.

{¶ 5} In April 2016, DCH and the Port Authority filed a seven-count complaint against Garrett, Heitz, and the Chicago Title Insurance Company ("CTC").   These counts included: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) unjust enrichment; (5) promissory estoppel; (6) declaratory judgment as to a mechanic's lien; and (7) breach of escrow/declaratory judgment.   Garrett and Heitz also filed counterclaims against DCH and the Port Authority, as well as a claim against Feldman, who was added as a counterclaim defendant pursuant to Civ.R. 13(H).   These counterclaims were based on: (1) breach of contract; (2) breach of an escrow agreement; (3) tortious interference with Garrett's business; (4) fraud; and (5) foreclosure of a mechanic's lien.[2]

---

[2] Any claims against CTC only involved $40,000 that CTC held in escrow on behalf of the parties in connection with the closing on the property that Garrett sold to DCH.

{¶ 6} The claims of the parties arose from a July 2014 contract that DCH entered into with Garrett to purchase the Property. The Property had been abandoned for years and was the scene of many environmental contaminants. Doc. #116, Michael Heitz Affidavit, ¶ 13.

{¶ 7} The Property, which was located near DCH, "was originally developed in the early 1900's for the Bernard Focke Slaughter House. By 1950, the slaughter house was replaced with the Dayton Rustproofing Electroplating Works, which operated a plating facility. Several electroplating companies operated on the property until 1996. After closure, both Ohio EPA and US EPA investigated the site and determined that large quantities of hazardous materials and waste were still on the property. In 1997, US EPA issued orders to Dayton Electroplate to stabilize and abate chemical hazards. The company failed to comply. In 2007, US EPA initiated an emergency removal of all waste materials and the plating lines and tanks within the buildings." Doc. #101, Michael Heitz Deposition, p. 51 and Ex. 8 (Development Agreement), Attachment A, Garrett/Valley Bates Stamp 04132.

{¶ 8} Michael Heitz was a member of Garrett, which was in the business of acquiring environmentally contaminated properties, cleaning them up, and remarketing the properties. Heitz Deposition at p. 17. Since its inception, Garrett had remediated about 14 industrial sites in Dayton, Ohio. Id. at pp. 20 and 23. Garrett's first project in this area was to clean up the Howard Paper Company. Id. at pp. 20 and 30. Typically, Garrett reviewed files of the U.S. EPA for properties that the U.S. EPA had cleaned up. The company also looked at property that had had violations with the Ohio EPA. Id. at pp. 23-24. If a location met Garrett's criteria, Garrett used its local firm, KERAMIDA, to

perform a Phase I report, to see if the property could be cleaned up. *Id.* at p. 24. At the time, Garrett worked with a project called Clean Ohio. Typically, after performing a Phase I and Phase II study, Garrett would obtain grants from the State of Ohio to clean up the property. *Id.* at p. 25. Subsequently, the program changed to JobsOhio under then Governor Kasich. *Id.*[3]

{¶ 9} Before Garrett purchased the Property, Garrett's environmental lawyer was able to get between $600,000 and $1,000,000 in U.S. EPA liens removed. Garrett's lawyer also worked with the Ohio EPA to resolve pending violations of Dayton Electroplate. Heitz Deposition at p. 70. In addition, Garrett had financed a Voluntary Action Program ("VAP") Phase I Assessment by KERAMIDA, which recommended "proper removal of Universal Waste, an asbestos inspection, and a subsurface investigation to evaluate soil and groundwater conditions" on the Property. Ex. 13, Covenant Not to Sue ("CNS"), Ohio EPA Director's Final Findings and Orders (February 29, 2016), p. 4; Doc. #98, Karen DeMasi Deposition 1, p. 58 and Ex. 84.

---

[3] JobsOhio was created in February 2011 by H.B.1. "The act authorized the creation of a nonprofit corporation, JobsOhio, for 'the purposes of promoting economic development, job creation, job retention, job training, and the recruitment of businesses to Ohio. R.C. 187.01. An appropriation from the Department of Development initially funded and established JobsOhio. 2011 Am.Sub.H.B. No. 1, Section 5. Thereafter, JobsOhio was given the right to purchase the state's liquor distribution and merchandising operations and to operate from revenues of the liquor enterprise." *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 2. The witnesses here have used both "JobsOhio" and "Clean Ohio" in their testimony, while the grant documents refer to the "Clean Ohio Assistance Fund." For purposes of this case, the specific term is not particularly significant, so we will refer to the information on the grant, which is "Clean Ohio." According to the Clean Ohio Fund's website, Dayton Electroplate was given a grant in June 2013. *See* http://gis5.oit.ohio.gov/cleanohio (accessed on October 28, 2019). Clean Ohio's last round of funding was in 2013. https://development.ohio.gov/cleanohio/BrownfieldRevitalization (accessed on October 28, 2019).

{¶ 10} In 2012, Garrett and the Montgomery County Land Bank ("Land Bank") entered into a memorandum of understanding ("MOU"). Pursuant to the MOU, the Land Bank facilitated an expedited tax foreclosure on the Property through the Montgomery County Board of Revision. The Property was then transferred to Garrett in November 2012, in exchange for Garrett's promise to demolish the existing structures and fill in the basements. *Id.* at ¶ 3. In November 2012, KERAMIDA also proposed a Phase II Property Assessment Work Plan. *See* Ex. 13 at p. 5.

{¶ 11} Garrett contracted with a company named MCM Demolition ("MCM") to demolish the buildings on the Property. MCM applied for and received a demolition permit for the Property in November 2012. Heitz Deposition at pp. 54 and 142-143, and Ex. 14-A; Doc. #97, Scott Adams Deposition, pp. 24-26. Before the permit was obtained, representatives from Garrett and KERAMIDA met with City of Dayton Chief Building Official Michael Cromartie about the project. Heitz had also met separately with Shelley Dickenson, the assistant Dayton City Manager. Heitz Deposition at p. 103.

{¶ 12} In January 2013, a press conference was held at the Property as MCM began demolition of the buildings on the property. DCH's facilities manager, Edd McGatha, attended the conference. Doc. #106, Edd McGatha Deposition 2, p. 20. McGatha knew at that time that the Property had environmental contamination issues. *Id.* By July 2014, MCM had taken the buildings down to the concrete slabs. Garrett paid $180,000 to MCM to demolish the existing buildings before eventually signing a purchase contract with DCH. Heitz Deposition at p. 71.

{¶ 13} Previously, in March 2013, the Dayton City Commission authorized the City of Dayton to enter into a development agreement with Heitz to remediate and demolish

the Property for future redevelopment. *Id.* at Ex. 8. Under the development agreement, Heitz was to complete a Phase II environmental assessment of the Property in accordance with the Ohio VAP and the Clean Ohio program, and demolish the Property. Ex. 8 at 04108. Phase I and II assessments indicate how "dirty" a site is and where contaminants are. A covenant not to sue can result from Phase I, Phase II, and remediation activities. Doc. #108, Matt Wagner Deposition, p. 129.

{¶ 14} In June 2013, the Ohio Controlling Board approved a Clean Ohio Fund grant for the project, which had been recommended by JobsOhio and the Ohio Development Services Authority ("ODSA"). *See* Ex. 8. The effective date of the grant was June 10, 2013, and the grant completion date was December 10, 2014. The grant agreement was between the City of Dayton and the Director of the ODSA. Ex. 8, Garrett/Valley Bates Stamp 04120. The project manager for the grant was Keith Klein, Senior Development Specialist for the City of Dayton. *Id.* Under the grant agreement, the City of Dayton was the grantee and received a grant amount of $195,654. *Id.*

{¶ 15} According to the description of the scope of work:

The project is in alignment with the City's plan for sustained growth in the DaVinci project area. This area is home to over 200 businesses and represents nearly 10,000 jobs within the City. * * * Redevelopment plans include a new medical office center either servicing the Children's Medical Center of Dayton or a doctor's group. COAF [Clean Ohio Assistance Fund] assistance will be used to finance a Phase II Environmental Assessment to determine the environmental suitability of the Project Property and the possible need for any remediation.

The Phase II Environmental Assessment will include the installation of 48 soil borings (up to 10 feet), 12 shallow groundwater monitoring wells (up to 50 feet), one deep bedrock groundwater monitoring well, soil vapor points, as well as a geophysical survey, property survey and reporting.   All assessment work will be conducted within the Project Property boundary.

Ex. 8 at 04132.

{¶ 16} The grant did not provide remediation or demolition funds; it only provided funding for a Phase II assessment.   However, when the Phase II project was completed in May 2014, the total amount of the grant had not been exhausted.   Garrett decided to finish the project and obtain a covenant not to sue or CNS, working in tandem with the City of Dayton, the EPA and the ODSA.   Wagner Deposition at p. 32.

{¶ 17} The DaVinci Project is the name of community development work that CityWide was conducting in two greater Dayton neighborhoods: McCook Field and Greater Old North Dayton.   A staff team had been working on a comprehensive development plan since 2012.   DeMasi Deposition 1 at p. 12.   The Electroplate site, which was within the DaVinci area, was a challenge for the City of Dayton.   "[T]here had always been a desire to have this site redeveloped.   It remained inactive for 20, 30 years and just sat there as an eyesore."   Wagner Deposition at p. 25; McGatha Deposition 2 at pp. 19-20 (describing the property as an eyesore and environmentally contaminated).

{¶ 18} In September 2013, the Dayton City Commission approved the Development Agreement, signed by Dickstein for the Dayton City Manager and Heitz on behalf of Garrett.   KERAMIDA, which had prepared the Phase I report, was in charge of preparing the Phase II assessment.   KERAMIDA billed the City of Dayton and was paid

directly by the City. Wagner Deposition at pp. 23-24 and 98. If costs exceeded the amount of the grant, Heitz was obligated to pay for the costs. Ex. 8. at 04109. The development agreement was to expire on December 31, 2015, unless extended or earlier terminated. *Id.* at 04110.

{¶ 19} In November 2013, Matt Wagner of KERAMIDA, Heitz, and Steve Ireland (Garrett's realtor) met with Edd McGatha and Deborah Feldman of DCH to discuss the Property. McGatha Deposition 2 at pp. 26-27. According to Feldman, this was a very general meeting. Heitz discussed the fact that he owned the Property and was working on remediating it. Doc. #100, Deborah Feldman Deposition, p. 9. Feldman knew there were environmental contamination issues with the Property. *Id.* She stated that this was a "meet and greet" with just general discussion, as DCH was not "even at the point of talking about purchasing the property." *Id.* at p. 10.[4]

{¶ 20} On December 27, 2013, Ireland sent a letter of intent to Feldman, proposing to sell the Property to DCH for $238,750 plus $10,000 each for four residential parcels. The letter noted that with regard to the Property, Garrett would "remove concrete slab and insure all environmental concerns regarding Phase I and II [were] answered to the satisfaction of the buyer." Doc. #102, Steve Ireland Deposition, p. 39, and Ex. 61. In mid-January 2014, Feldman informed Ireland via email that DCH had been working closely with Citywide as part of the broader development project, and that she had asked

---

[4] There are factual issues about whether this was the first meeting, and about whether the parties discussed the use of the property as green space. *See* Wagner Deposition at pp. 21 and 94-96 (indicating the first meeting was before the Clean Ohio application was submitted and that green space was discussed as one option for the land's use, but generating jobs was a requirement for a grant and use for green space would not satisfy that requirement). In contrast, Feldman denied green space was discussed at the first meeting. Feldman Deposition at p. 20.

Karen DeMasi to represent DCH in any negotiations related to the purchase of the properties. *Id.* at p. 40 and Ex. 62.

{¶ 21} Subsequently, on January 21, 2014, DeMasi countered to Garrett with an offer of $175,000. As part of the agreement, DeMasi stated that DCH would send a letter to JobsOhio indicating its desire to take possession of the property and would "encourage the State to award additional grant money to this open project so that the Seller can complete environmental remediation in accordance with the State of Ohio and City of Dayton Practice." Ireland Deposition at p. 41 and Ex. 63, pp. 2-3. Ireland then countered back with a price of $250,000 for just two of the properties, including the Property and another parcel at 1002 Valley Street. Ex. 63 at pp. 1-2. At that point, DeMasi sent Ireland an email indicating that DCH was not interested in buying the properties at the requested price and did not wish to present a counter offer. *Id.* at p. 1.

{¶ 22} In the winter of 2014, Heitz met with John Scott of Bladecutters at the Property and asked for a demolition quote. Doc. #107, John Scott Deposition, p. 29. Subsequently, on May 9, 2014, the KERAMIDA VAP Phase II Assessment was submitted to the Ohio Department of Transportation. DeMasi Deposition 1 at p. 59 and Ex. 85. Keith Klein, who was in economic development at the City of Dayton, was copied with the material and would have shared a copy with CityWide. Ex. 85 at p. 1; DeMasi Deposition 1 at p. 60. The Phase II Assessment included "a geophysical survey of the lot, the installation of soil borings and monitoring wells and analysis of concrete samples for mercury and PCBs" Ex. 13, Ex. 3 attached to Exhibit 13 (December 13, 2015 Ohio EPA Director's Executive Summary, p. 5) ("Executive Summary"). As noted, the grant money was not exhausted, and a decision was made to pursue a CNS for the Property.

{¶ 23} According to Wagner (of KERAMIDA), after May 2014, but before the contract to purchase was signed in July 2014, there was a meeting with DCH. Heitz asked Wagner to participate based on the information that was going to be discussed, which was the Phase II assessment findings. At the meeting, they went over the general parameters of the findings and that it looked suitable for the project to go forward. There was discussion of the overall plan, which at that time was green space. Wagner Deposition at p. 44. The use of green space emerged based on what KERAMIDA had found in the soil and groundwater and the likelihood for future use. According to Wagner, DCH indicated that it needed or wanted more green space based on what DCH was doing at the corner of Stanley Avenue and Valley Street (creating an entrance into the hospital area). Green space fit better into DCH's plans. *Id.* at p. 45.

{¶ 24} Again, according to Wagner, McGatha brought up the fact that to make the property look better, it temporarily needed to be covered as green space; during this temporary time, there would have to be grass on the property, but demolition and removal of the concrete would still be necessary at the property. No demolition (other than removing the buildings) had occurred at that time. Wagner stated that "[t]he ultimate desire was that it was going to be developed into a medical office. However, based on discussions that were had, it was very clear that green space was likely the end result of the project." *Id.* at pp. 47-48. The discussion was that, based on what they were finding in the soil and groundwater, the property's future was going to be green space. *Id.* at p. 59.[5]

---

[5] Again, there is a factual dispute. McGatha testified that he was not aware of anyone on behalf of DCH telling Heitz that the property would be used as green space, other than in the first meeting, when the concrete was still visible. McGatha stated that a discussion

{¶ 25} Due to his expertise and having talked to his certified professionals and engineers, Wagner wanted the concrete below ground to remain. He stated that this was discussed during the meeting. *Id.* at p. 87.[6]

{¶ 26} On June 11, 2014, DeMasi sent an email of "high" importance to Feldman, Dickstein, and McGatha regarding Electroplate. In the email, DeMasi stated that:

I spoke to Steve Ireland today about the Electroplate site and Mike Heitz's plans. *You will recall that without an end user that guarantees jobs, Mike cannot access Clean Ohio funds for remediation. This means that even if we had a deal with Mike to purchase this site, our use [of] "green space" would not get him funding from the State.*

Steve said that Mike has decided to clean up the site using his own funds. He does not believe the site will be marketable unless he does this and he wants the "covenant not to sue" from the EPA which he will receive it he remediates to their standards. Apparently he does not have an end user at this moment that can guarantee jobs at the site.

If Dayton Children's wants to purchase, the price remains the same $75K per acre (3.2 acres x $75K = $240k). He will also tear down the adjacent house for $10k. So total cost for everything would be $250k. He

---

occurred about whether the concrete could be covered and used as green space until the remainder of the demolition occurred. According to McGatha, the answer DCH received was "no." McGatha Deposition 2 at pp. 69-70.

[6] McGatha stated in an affidavit that DCH would not have entered into the contract (and a third amendment to the contract) if it had known that Garrett and Heitz were not going to remove all concrete and other materials below the property. Doc. #112, McGatha Affidavit, ¶ 6. As will be noted later, this was not consistent with McGatha's deposition testimony.

would meet all the conditions outlined in his original agreement to him [sic].

We could offer him less money and clean up the site ourselves, but I am not sure we can do it any cheaper. Plus we need to consider the money he already has put in which is substantial. Personally, if the funding is available, I think we should try and get this site. Maybe we can get it for under $250k but I am thinking it will have to be at least $200k.

(Emphasis added.) DeMasi Deposition 1 at p. 90 and Ex. 88, p. 1.[7]

**{¶ 27}** DeMasi then reminded the recipients of the email about the investment Garrett had already made in the property. She noted that Garrett's estimated private investment to date was $5,000 for an application fee and title work with the Land Bank; $5,000 for a Phase I study; and $200,000 plus in demolition costs. Ex. 88 at p.1. The public investment for the Clean Ohio Grant for the Phase II work was $195,000, with Garrett being responsible for any cost overruns. Ex. 88 at p. 1.[8]

**{¶ 28}** Subsequently, in conversations with DCH, DeMasi prepared a June 14, 2014 letter of intent for the purchase of five parcels, including the Property, for $225,000. Among the seller's responsibilities with respect to the Property was that Garrett "[r]emove concrete slab." DeMasi Deposition 1 at pp. 45-47 and Deposition Ex. 81. DeMasi testified that she understood "a slab as being held up by footers, foundations, and all of

---

[7] Statements in this email contradict the deposition testimony of Feldman and McGatha about the lack of discussion of green space. Also in contrast, Feldman stated in her deposition that DCH always had two objectives for the property: (1) the hospital was growing and there continued to be ideas for using it for some particular hospital use; and (2) developing the property for the neighborhood and the City of Dayton. Feldman Deposition at p. 50.

[8] The $195,000 was not paid to Garrett; it was paid to KERAMIDA for its work.

that." *Id.* at p. 47.  In addition, DeMasi stated that "There were numerous discussions with the parties on what a clean site, shovel-ready means."  *Id.*[9]

{¶ 29} In June 2014, DeMasi also prepared a request for Clean Ohio Funds to assist Heitz.  DeMasi Deposition 1 at pp. 50-52 and Ex. 83.  In this Clean Ohio request, DeMasi stated that a purchase agreement had been negotiated between DCH and Garrett and would be executed by August 1, 2014.  After discussing DCH's economic role in the area and the 2014 announcement of a $140 million expansion of the hospital's Dayton campus, including a new 260,000 square foot, eight-story patient care center, DeMasi mentioned that clean-up of the Electroplate site was "vital to the economic interests of Dayton Children's Hospital and the revitalization of the community through the DaVinci Project."  Ex. 83 at p. 6.   At the time, DeMasi understood that a condition of the grant was that it had to be tied to creating jobs.  DeMasi Deposition 1 at p. 50.  According to DeMasi, "that was kind of dicey, because *there were no real plans.*" (Emphasis added.)  *Id.*

{¶ 30} Ireland, who prepared the purchase agreement, indicated that he used the

---

[9] There are also factual disputes in this context.   Both Ireland and Heitz denied that DCH ever asked for removal of the foundation or footers or all the footers.   Ireland Deposition at p. 88; Heitz Deposition at p. 172 (denying that he had told anyone the property would be "shovel-ready" before the closing).   As to specific expressed communications by Garrett, McGatha stated that Heitz did not say he would remove all the concrete from the ground and Heitz did not say he would not.   McGatha Deposition 2 at p. 61.   McGatha did say in an affidavit filed in the trial court that Garrett and Heitz always represented to DCH "[p]rior to the closing on July 24, 2015 that this was going to be a 'shovel ready' site, i.e., that if you stick a shovel in the ground it would only be dirt and there would not be concrete and other debris still in the ground."   Doc. #112, McGatha Affidavit, ¶ 8. However, this conflicts with McGatha's prior deposition testimony, which was taken some months earlier.   Other individuals also had differing beliefs as to the meaning of "shovel ready."   *Compare* Heitz Deposition at p. 36; Ireland Deposition at pp. 36-37; DeMasi Deposition 1 at p. 58.

language that had been sent to him by DCH, as reflected in Exhibit 81. Again, these terms included "[r]emove concrete slab." Ireland Deposition at pp. 87-88. Before the property went under contract, Ireland and Heitz told DeMasi and McGatha that there was a lot more than just concrete slab on the property. There were also foundations and basements. DeMasi Deposition 1 at p. 57. DeMasi stated that she and Heitz had extensive discussions about what the demolition would be. She could not answer why they selected just the concrete slab, and did not just say to remove all concrete from the property. *Id.* at p. 77.

{¶ 31} On July 10, 2014, Bladecutters submitted a quote to Heitz for removing "concrete slab foundation & asphalt" at the Property. Scott Deposition at p. 30, and Ex. 28, Bladecutters' Bates Stamp 0001. Together with other items like grading, backfilling with topsoil and seeding, and capping sewers, the total quote was $48,221. *Id.* However, a contract was not signed before the closing on the Property; instead, a contract that Garrett prepared was signed sometime in the fall of 2014. Scott Deposition at pp. 29-31. In July 2014, Garrett also submitted the new request for Clean Ohio funds. DeMasi believed Garret was going to use the grant to do further remediation on the Property. DeMasi Deposition 1 at p. 53. Apparently, the request was not approved, as there is no further mention of a grant from Clean Ohio.

{¶ 32} On July 23 or 24, 2014, DCH and Garrett signed a contract of purchase regarding the Property only. The Property was a vacant parcel of land, and the purchase price was $225,000, with $15,000 earnest money to be deposited in the broker's trust account, and the remainder to be paid at closing. In the contract, Garrett made the following representations:

Seller represents that those signing the contract constitute all of the owners of the Property, together with their respective spouses. Seller further represents that with respect to the property (a) Seller shall remove concrete slab (b) insure all environmental concerns regarding Phase I and II are answered to the satisfaction of the buyer (c) Request & obtain a State of Ohio EPA "Covenant Not to Sue" letter prior to close regarding this property (d) De-rock & seed the property (e) that no orders of any public authority are pending (f) no work has been performed or improvements constructed that may result in future assessments, (g) no notices have been received from any public agency with respect to condemnation or appropriation, change in zoning, proposed future assessments, correction of conditions, or other similar matters.

Ex. 11 (Contract to Purchase), "Seller's Representations," p. 2, ¶ 8.[10]

**{¶ 33}** The contract further provided that the "closing for delivery of the deed and payment of the balance of the purchase shall be scheduled 10 days after Purchaser receives a State of Ohio EPA 'Covenant Not to Sue' from the Seller." *Id.* at p. 2, ¶ 11. In addition, the contract stated that it contained all the terms of the parties' agreement and that there were "no oral conditions, representations, warranties or agreements." *Id.* at p. 2, ¶ 12 ("General Provisions"). Furthermore, the contract said that "[u]pon Purchaser's examination of the Property as provided herein, and except as otherwise provided in this Contract, Purchaser is accepting the Property 'as is' in its present

---

[10] The Contract to Purchase was amended five times. The contract and the amendments are all contained in Ex. 11, which was used in the depositions of the parties and witnesses.

condition (unless otherwise stated), relying upon such examination as to the condition, character, size, utility and zoning of the Property." *Id.*

**{¶ 34}** An addendum to the contract (also included as part of the contract to purchase) gave DCH "the right to enter onto and into the property for tests, environmental and engineering studies and tests, surveys, planning and other testing and exploratory work necessary to formulate plans for the purchase of the Property * * *." Ex. 11, Addendum, p. 4, ¶ 2. In the event that DCH made objections after inspection, a cure period was provided for Garrett to take actions necessary to cure the objection, and DCH had the right to cancel the purchase if Garrett were unwilling or unable to cure. *Id.* at ¶ 4-6.

**{¶ 35}** Finally, the Addendum provided that:

In addition to the representations and warranties set forth in the Contract to Purchase, Seller also represents and warrants to Purchaser as follows: * * * (c) to the best of Seller's knowledge, there is no violation or alleged violation of any legal requirement affecting the Property, including, without limitation, any violation or alleged violation of any zoning, subdivision, fire, safety, health, accessibility, environmental or other codes, laws, ordinances, statutes, regulations, rules or orders of any city, county, state and/or federal authorities with jurisdiction in these matters.

*Id.* at p. 5, ¶ 10.

**{¶ 36}** The addendum to the contract also stated that "Seller warrants that all information provided to Purchaser during due diligence is accurate, complete, and not misleading. If Purchaser's inspections of the Property disclose any matters to which

Purchaser reasonably objects, Purchaser shall notify Seller in writing specifying the objections prior to the expiration of the applicable Inspection Period." *Id.* at p. 4, ¶ 4. No time deadlines for inspection periods (other than for a title commitment) were made in the addendum. In fact, DCH had the right to access the property during "each applicable inspection period." *Id.* at p. 4, ¶ 3.

{¶ 37} During the initial inspection period, DCH decided what inspections it wanted done. These included a title exam and a Phase 1 environmental study. DeMasi Deposition 1, at p. 104; McGatha Deposition 2 at p. 16. No one reviewed the records pertaining to demolition permits or inspections, although those were available online, and neither DCH nor its agents checked with the building department for permit status or to see if any violations existed. DeMasi Deposition 1 at pp. 105-106; McGatha at p. 66; Heitz Deposition at pp. 147-148.

{¶ 38} At that time, Section 153.16 of the City of Dayton Unified Building Code (R.C.G.O.) provided that:

Whenever any building or structure is demolished, in whole or in part:

(A) All structural elements and materials shall be completely removed from above and below the surface of the land, unless the building official approves partial removal thereof, based upon his or her determination that complete removal would be:

(1) Physically impractical;

(2) Harmful to a connected or adjacent structure, street, sidewalk, or alley;

(3) Environmentally unsafe, or require extensive environmental

remediation;

(4) If the complete removal will cause the property to be in violation of another applicable law, code, or regulation; or

(5) If the costs of complete removal are not economically justified in light of the intended uses of the property after demolition.

{¶ 39} Under the ordinances, the Building Official of the City was required to serve written notices of violations of the code provisions or of permits under the Code "on the person or persons responsible for such violation * * *." R.C.G.O. 153.28(D). The Building Official was also required to "keep official records of applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued." R.C.G.O. 153.06(G). Further, "[a]ll inspection reports shall be in writing and shall be certified by the licensed authority, or responsible officer of the service, or the individual when expert inspection services are accepted." R.C.G.O. 153.11(G). The ordinances additionally provided a right of appeal for an owner from the decision of the Building Official. R.C.G.O. 153.16(F).[11]

{¶ 40} MCM had completed all its demolition work (which related to the buildings) before July 2014, when the Contract to Purchase was signed. Heitz Deposition at p. 54. According to City records, a rough inspection of the Property was later rejected on October 6, 2014. Adams Deposition at pp. 25-26 and Ex. 45. There are two kinds of inspections: a rough inspection, where an inspector looks at a hole to make sure everything has been removed; and a final inspection. This latter inspection occurs when

---

[11] Due to conversations and an understanding with the City of Dayton, Heitz claimed he had an exception that allowed him to leave concrete in the ground. Heitz Deposition at pp. 207-208.

property is regraded and filled with proper fill materials, and the City makes sure it is graded and that water runoff will not affect a neighbor's property or affect a street roadway. Adams Deposition at pp. 28-29. On a large property, an inspector may go out multiple times because concrete may be removed in sections. *Id.* at p. 28.

{¶ 41} The notes from the October 2014 rough inspection state: "rough rejected, dash, building has been demolished to slab foundation, dash, need to remove footer, foundation, and patch sewer." *Id.* at p. 32 and Ex. 46. Both John Scott of Bladecutters and Heitz denied ever knowing about this rough inspection. Bladecutters did not begin its work until around January 2015, and a contractor does not have to be present during inspection, although it is up to a contractor to schedule inspections. Scott Deposition at pp. 35 and 37; Heitz Deposition at pp. 144-146; Adams Deposition at pp. 29 and 31. Failure of a rough inspection is not a violation. Heitz Deposition at p. 145; Adams Deposition at p. 127. No evidence was offered concerning whether anyone from Garrett or MCM was at the site when this rough inspection was done, and there was no evidence of any written notice to MCM or Garrett. *Id.* at p. 34.[12]

{¶ 42} The contact that was eventually signed in the fall of 2014 (and prepared by Garrett) required Bladecutters to "remove all concrete and asphalt except for sidewalks from the entirety of the property * * *." Scott Deposition at pp. 31-32 and Ex. 29 at 0003. According to Scott, this was for demolition and removal of all the materials above and below the ground. *Id.* at p. 31.

{¶ 43} In early November 2014, DCH objected to certain conditions of the title commitment of CTC, and the parties then signed a First Amendment to the Contract in

---

[12] None of the parties offered testimony from any MCM employees.

early December 2014, allowing Garrett until January 15, 2015 to evaluate and cure the defects. If Garrett were not able to do so, DCH could terminate the contract at any time before February 20, 2015, by giving written notice to Garrett. Ex. 11, First Amendment to Contract to Purchase, p. 1.

{¶ 44} In the meantime, a third meeting took place in late November 2014, and the participants were Heitz, Wagner, Ireland, and DeMasi. Wagner Deposition at pp. 63-64, and 68; DeMasi Deposition 1 at p. 70. The main point of discussion was the CNS, which was the reason Wagner was at the meeting. KERAMIDA had performed some additional investigations, so there was further data to talk about. This data was primarily related to the western part of the property, and the fact that some groundwater concerns were associated with it. KERAMIDA had some strategies to achieve a CNS on the Property and how that could still be obtained, but it would not be for the entire parcel. Wagner Deposition at p. 64. The solution KERAMIDA proposed for this concern was to parcel out the area for the CNS, which would still achieve the goal of the grant, which was to obtain a CNS. *Id.* at p. 67. However, obtaining a CNS for the entire property was not attainable because there were elevated levels of hazardous substances on the western part of the property and additional work would be required. *Id.* at pp. 68-69. This area could be cleaned up, but it was not within the parameters of the grant. *Id.* at p. 70. Before this meeting, the concrete had not been removed from below the surface. *Id.* at p. 74.

{¶ 45} According to DeMasi, there was discussion about Garrett completing the demolition and she was assured Garrett could do that. DeMasi Deposition 1 at p. 71. At the end of this meeting, Ireland asked DeMasi what she thought DCH would do.

DeMasi said that DCH would probably want to renegotiate, that she would tell DCH there would be a meeting, and that the parties would have to come together and figure out what they would do. *Id.* at p. 72.

**{¶ 46}** DeMasi indicated that the other part of the Property (not subject to the CNS) was not unbuildable, but would be limited as to what could be built. A parking lot could probably be built on it. If one wanted to spend the money to remediate it, anything could be built there. Wagner clearly indicated during the meeting that a lot more work would have to happen on the part of the Property that was not going to be subject to the CNS. *Id.* at p. 73.

**{¶ 47}** According to Wagner, options were discussed about how to move the project forward, such as scaling back the area covered by a CNS; having DCH enter into a 100-year lease on the contaminated piece; or bringing in two feet of fill to create a separation on the contaminated part as a remedial approach and still trying to allow the property to be further developed. Wagner Deposition at pp. 113-115. Wagner eventually left KERAMIDA in April 2015. However, he was told by his supervisor, Michael May, between this meeting and when he left, that only the concrete slab was going to be removed. *Id.* at pp. 76-77.

**{¶ 48}** On November 28, 2014, McGatha of DCH hired MAKSolve to do various tasks, including: (1) reviewing KERAMIDA's Phase I and Phase II Assessments of the Property; (2) providing a professional opinion of the completeness of the work done to date; (3) giving insight, based on DCH's goals for the site, "into potential remedial strategies for possible future work and potential funding resources"; and (4) providing a professional opinion "in regard to the reasonableness of a verbal remedial cost estimate

provided to Dayton Children's Hospital" by Heitz. Michael Kerr Deposition, Doc. #103, pp. 6-7 and Ex. 96. Kerr was unable to answer whether a report was generated because the work was performed by an independent contractor. *Id.* at p. 8.[13]

{¶ 49} By December 1, 2014, KERAMIDA had finished an amended Phase II Assessment, which included "results of additional sampling to define further metals and groundwork solvents in the south of the property." Executive Summary at p. 5. At some point after December 1, 2014, when Phase II was completed, Wagner told the City of Dayton Economic Development Department that it would be best to leave the concrete below grade. Wagner Deposition at p. 141. This would have occurred after Phase II was completed, because Garrett and KERAMIDA would then have had the information. *Id.* The people present at this meeting were Wagner, Keith Klein, and Klein's supervisor, Timothy Downs. *Id.* at pp. 141-142. During direct discussion with the City of Dayton, when Wagner said it would be best to leave everything at or below ground level, no one from the City said that they could not do that. *Id.* at pp. 91-92.[14]

{¶ 50} In December 2014 or January 2015, Bladecutters started demolition work at the Property. Executive Summary at p. 11; Scott Deposition at p. 37.[15] In January 2015, KERAMIDA completed a Phase I Update, which "revealed that the northern Portion of the lot (the VAP Property) meets all applicable standards with activity use limitations

---

[13] Neither side submitted any testimony from this independent contractor.

[14] Neither side presented any testimony from Klein or Downs.

[15] There is a factual conflict here. Scott indicated that Bladecutters began demolition in January 2015, but the Ohio EPA Director's executive summary indicates that two existing fuel oil underground storage tanks were excavated on December 14, 2014. Executive Summary at p. 11.

(AUL) applied to the Property by and environmental covenant (EC) to restrict residential development on the Property." Executive Summary at p. 5.

{¶ 51} On January 13, 2015, DeMasi sent an email to Ireland, noting that she had noticed heavy equipment at the site. She asked Ireland: "Will they be removing all slabs & footers?" Ireland Deposition at p. 54 and Ex. 68. In addition, DeMasi asked about other items, including the status of the title issues and the CNS, and whether another contract extension was needed. *Id.* Ireland responded to DeMasi's email on January 15, 2015, stating, among other things, that "We are taking the slabs and footers up and have removed the two underground tanks which is required for the NFA [no further action letter] and CNS on the appropriate 1.4 acres of land toward Valley and Stanley." Ireland Deposition at p. 54; Ex. 68. Ireland testified that he may have misspoken in this email, because the contract only required removal of the slab. Ireland Deposition at p. 69. He further said that he did not intend for this to be misleading, as he was more concerned about whether Garrett was in compliance with the NFA and CNS. *Id.* at pp. 70-71.

{¶ 52} Ireland also said that "I'm assuming I carried it [the language] over from her email to me. I just parroted it back to her." *Id.* at p. 72. Ireland could not recall if he called Heitz before making the statement about the slabs and the footers. *Id.* at pp. 54-55.[16] Finally, Ireland stated that he had no idea what the City's permit requirements were, had not ever dealt with a demolition permit issue with the City of Dayton, and was not aware of a requirement of taking out all materials above and below the ground. *Id.* at p. 72.

{¶ 53} A few days later, Ireland wrote again to DeMasi and stated that "I met with

---

[16] No evidence was presented that Ireland did call Heitz before making the statements.

Mike [Heitz] and he is underwater on the property in terms of his own expenditures.   As a result, he is unable to make any concessions on the current price despite the changes to our deliverables. * * * He reminded me he had cleared, demolished and donated a number of properties on Valley to the benefit of the Hospital and he hoped that this could be considered as both good will and some level of consideration as we work through this process with the Ohio EPA."   Ireland Deposition at p. 55.   Ireland believed this related to the discovery that Garrett could not furnish a CNS on the entire three-acre parcel. *Id.* at pp. 55-56.

{¶ 54} On January 26, 2015, Michael May, a "certified professional" from KERAMIDA, submitted a "no further action" ("NFA") letter to the Director of the Ohio EPA, which described "the investigational and remedial activities undertaken at the Property." *See* Ex. 13, Covenant Not to Sue, Director's Final Findings and Orders (February 29, 2016), pp. 1-2.   May also submitted addenda to the NFA letter on May 28, 2015, August 27, 2015, and December 23, 2015.   *Id.*

{¶ 55} A few days after the NFA was submitted to the EPA, DCH signed a Second Amendment to the Contract. The parties wanted to extend the time period within which Garrett could cure title defects and satisfy environmental covenants because the process would take several months.   Ex. 11, Second Amendment at p. 1.   Garrett was given until August 1, 2015.   DCH could terminate the purchase contract any time before September 1, 2015, if Garrett could not cure the title defect and DCH could not acquire the Property with all the environmental covenants having been secured within the cure period.   *Id.* at p. 2.   The effective date of the Second Amendment was January 26, 2015. *Id.* at p. 1.

{¶ 56} On February 6, 2015, DCH sent out an email to DeMasi, Heitz, and Ireland, asking about their availability for a meeting on February 18 or 20, 2015. The meeting participants included McGatha, Feldman, DeMasi, Ireland, and Heitz. Ireland Deposition at p. 57, Ex. 70. Ireland could not recall anything being discussed at the meeting other than the CNS and NFA. *Id.* at p. 31.

{¶ 57} Wagner recalled attending a fourth meeting with DCH a few months after the November 2014 meeting, which is consistent with the February 2015 meeting. Wagner Deposition at p. 80-81. The meeting was a follow-up to confirm what they were doing. *Id.* at p. 81. He recalled that the participants in the meeting were himself, Heitz, Ireland, DeMasi, Feldman, and perhaps McGatha. *Id.* at p. 80.[17] According to Wagner, there were discussions about leaving portions of concrete on the site during the third or fourth meeting with DCH. *Id.* at p. 114. Wagner further said that "there was [sic] discussions of parking for green space and where that could occur. And if you left the concrete there, that would minimize the amount of work needed to be done." *Id.* at pp. 114-115. Wagner was under the impression that it was acceptable to DCH to leave concrete on the site as long as it was covered with dirt. *Id.* at p. 115. He believed McGatha would have said that. *Id.* at p. 116. DCH just wanted a clean-looking site that would be esthetically pleasing as a gateway to DCH. *Id.* Wagner also thought a good strategy was to leave any concrete at grade or below in place to eliminate the direct

---

[17] Both Feldman and McGatha did not recall being at such a meeting. They each claimed they had only one meeting after the contract was signed, and this was prior to agreeing to a Third Amendment of the Contract, which occurred in late May 2015. Feldman Deposition at p. 45; McGatha Deposition 2 at pp. 26-27. McGatha only recalled Heitz being at that meeting. *Id.* at p. 27. Feldman recalled that the Third Amendment meeting occurred in May or June 2015. Feldman Deposition at p. 45.

contact pathway for human contact and the potential migration of contaminants from the dirty side of the Property to the clean side. *Id.* at p. 117-118.[18]

{¶ 58} In early February 2015, or about halfway through Bladecutters' job, John Scott of Bladecutters requested a change to the contract regarding removing the foundations. Scott Deposition at pp. 33-34. At that time, Heitz told Scott that the foundation would not be removed because the Property was going to be parkland. *Id.* at p. 40. Scott and Heitz also discussed the fact that KERAMIDA would be out doing samples and that Heitz did not want to disturb too much of the soil. In addition, Heitz stated that he had a covenant or exception with the City to removing all the concrete. *Id.* at pp. 40-41. By mid-to-late February or early March 2015, Bladecutters had finished demolition removal and had received most of its money ($46,000). Bladecutters brought in dirt and graded the Property. *Id.* at pp. 40 and 48.

{¶ 59} Scott then called the City of Dayton in April 2015 for an inspection of the Property. Scott Adams of the City's Division of Building Inspection came out and said there could not be any foundations in the ground. Scott Deposition at p. 50; Adams Deposition, pp. 42-44. Adams did not document this visit in the department's records, nor did he send Heitz a written notice about the issue. *Id.* at pp. 125-127. No notices of violations were ever issued and there were no orders by any public authority affecting

---

[18] DeMasi recalled the prior meeting at Ireland's office and a follow-up meeting at DCH with Ireland, Heitz, McGatha, and Feldman. She did not think Wagner was there. She denied that Wagner had discussed leaving the foundation in place to control migration of contaminants from the dirty side to the clean side. DeMasi Deposition 1 at pp. 117-119. McGatha also said that he could not recall any communications between Garrett or Mike Heitz and anyone at DCH about leaving certain parts of the concrete in the ground to contain environmental contaminants. Doc. #`105, McGatha Deposition 1 at pp. 128-129.

the Property.   Adams at pp. 103-104.[19]

{¶ 60} Scott testified that he told Heitz that Adams had said there could not be any concrete buried at the site; Heitz responded that he would take care of it.   Scott Deposition at p. 51.   Heitz initially said that he could not remember if Scott told him that he had met with the City of Dayton.   Heitz Deposition at p. 113.   Heitz then said he had never heard from Scott that there were any issues with the demolition work they did or did not do at the Property.   Heitz at p. 115.

{¶ 61} About two weeks after Adams visited the site, Adams called Scott to ask why he had not completed the work as he had said he would.   At that time, Scott said that Heitz was not going to pay him to remove the footers and foundation.   Adams Deposition at p. 47.

{¶ 62} In April or May 2015, DCH engaged MAKSolve to look at the Valley Street property.   DCH initially asked MAKSolve to evaluate funding opportunities in Ohio to assist with acquiring the Property.   Kerr Deposition at pp. 5-6.   Regarding the grant for DCH, Kerr recalled discussion about Ohio Brownfields redevelopment grants and JobsOhio grants.   However, none of those funding sources would work because they all required that jobs be created or moved to the site.   Id. at p. 15.

{¶ 63} As noted, DCH had until September 1, 2015 under the Second Amendment

---

[19] The testimony of Karen DeMasi of CityWide suggests that this inspection incident may have occurred in the summer of 2015, *after* the closing.   Specifically, a September 11 email from DeMasi indicated that Adams had met Scott at the site *a few weeks before her email* and that Bladecutters "dug a few holes which showed that the footers were still there."   DeMasi Deposition 2 at p. 153 and Ex. 126.   According to DeMasi, this would have been in August 2015.   Id. at p. 153. During depositions, neither Scott nor Adams mentioned such an event, although they were both asked about all contacts with each other.

to cure the defects and obtain the environmental covenants.   However, in May or June 2015, Feldman called a meeting with Heitz.   According to Feldman, things were not moving along and they had some delays.   DCH wanted to get together with Heitz and see what could be done to expedite and resolve the contract so they could close. Feldman Deposition at p. 45.   They still did not have a covenant not to sue, and so that was probably the issue that brought them to the table.   *Id*.   DCH and Garrett ended up amending the contract a third time based on a number of issues.

{¶ 64} Heitz testified that the parties talked about the whole project in May 2015, including that Garrett would take the cement slab off and go down four inches on the foundation, fill it up with soil, and then plant grass on top of it.   DCH told him to do that because they hospital did not want to develop the property; it just wanted green space. Heitz Deposition at pp. 95-96 and 162.

{¶ 65} The slab was already gone by May 2, before the Third Amendment to the Contract.   *Id*. at pp. 109-110.   According to Heitz, the $25,000 reduction in price was because Garrett was not going to take out the foundations on the buildings as well.   To take out the slab was the task for which Garrett had paid Bladecutters $50,000.   The slabs were not the most dangerous part to move; taking out the foundations was, because it involved moving the soil.   The foundations acted as a barrier to chemicals that had gone into the soil.   *Id*. at pp. 106-109.    Heitz also said that Bladecutters had been going to remove everything, including the foundations for $75,000, but had reduced its price by $25,000.   Heitz Deposition at pp. 119-120.[20]

---

[20]  Again, there are factual disputes.   McGatha said that neither Heitz nor anyone on his behalf had discussed or communicated during this meeting that Heitz would be leaving some of the concrete in the ground to contain the environmental contaminants.   McGatha

{¶ 66} By the time of the Third Amendment, DCH had decided to accept "as is" the part of the property that did not have a pending CNS and was not "shovel ready." Feldman Deposition at p. 62. Heitz denied ever telling DCH that the site would be "shovel ready" for DCH's purposes. Heitz Deposition at p. 169.

{¶ 67} Because DCH still wanted to purchase the property, DCH and Garrett agreed to reduce the price by $25,000, to $200,000. Feldman Deposition at p. 47. They also added a condition precedent to Garrett's obligations that it would consent to DCH's assignment of its own contractual obligations to the Port Authority or another entity that DCH identified. *Id.* at p. 48 and Ex. 11, Third Amendment at p. 1.

{¶ 68} Under the Third Amendment, DCH acknowledged that Garrett intended for the transfer to be a "bargain-sale" for federal tax purposes; DCH also agreed to sign such documents at closing that Garrett would reasonably require, including an "Acknowledgment" IRS form 8283, to substantiate Garrett's charitable contribution. *Id.* at p. 2. The parties further agreed that Garrett's obligation to satisfy the environmental conditions only applied to the Remediated Property (the CNS part), that if these conditions were not satisfied at closing, they would continue until satisfied in full, and that to secure Garrett's obligations, the parties would agree to an escrow agreement substantially like Ex. B, which was attached to the Third Amendment. *Id.* To secure post-closing obligations, the parties agreed that $40,000 would be placed with CTC in an escrow

---

also did not recall any communication about the concrete in this meeting. McGatha Deposition at pp. 51-52. Furthermore, Feldman had no recollection of a discussion about removing the slab and four to six inches of the foundation, and leaving concrete in the ground to contain environmental contaminants. Feldman Deposition at p. 66. However, Feldman also said that she did not really recall the details of the conversation. *Id.* at p. 52.

account and would be retained until Garrett received and delivered the EPA's Covenant Not to Sue. *Id.*

{¶ 69} In addition, the parties agreed that the closing would take place on or before June 15, 2015. *Id.* at p. 3. The Third Amendment also said that "[i]n all other respects, the Agreement is hereby ratified and affirmed and shall remain in full force and effect." Ex. 11, Third Amendment at p. 3.

{¶ 70} The Third Amendment was effective May 27, 2015. On June 10, 2015, DCH signed a proposal by MAKSolve to conduct a Phase I Environmental Site Assessment of the Property. Kerr Deposition at p. 19 and Doc. #97. Under the scope of work, MAKSolve agreed to try to identify historical property uses by reviewing various sources, including property ownership history "based on sources of information such as deed, zoning/land use/building department and/or tax assessment records." Doc. #97, p.1.

{¶ 71} Further, MAKSolve was to try "to contact the local fire, health, building, zoning, water and sewer departments for information on known or suspected environmental impacts such as fires, spills, releases and violations associated with the property." Doc. #97, at p. 1. MAKSolve was also to be provided "means of access to the property for purposes of conducting the required site reconnaissance." *Id.* at p. 2. Moreover, within 48 hours after this reconnaissance, MAKSolve was to provide a "verbal assessment." A formal written report was also to be delivered to DCH within 10 days after the reconnaissance. *Id.*

{¶ 72} On June 12, 2015, DCH and Garrett signed a Fourth Amendment to the Contract, agreeing to extend the closing date to July 10, 2015. *See* Ex. 11, Fourth

Amendment. Subsequently, in late June 2015, DeMasi asked Ireland if DCH could add fill to the lot before taking possession, because Danis Construction was hauling away fill from another project on DCH property. Ireland Deposition at pp. 60-61. Ireland then sent Heitz an email, stating that "I realize we are very close to close and *I also told her we have already been punished by the City of Dayton for backfilling the site and covering where the concrete pad once stood. I also let her know you were not happy about that and she [should] also check with the city*." (Emphasis added.) Ireland Deposition at p. 60 and Ex. 72. Ireland testified that he believed "we" was a reference to Garrett. Ireland did not know what the actual punishment was. He believed Garrett may have been criticized because it had removed the concrete pad, backfilled it, and covered it with dirt, but apparently no one had inspected its removal. He received information from Heitz that the City was apparently not happy with that. *Id.* at pp. 62-63.

{¶ 73} Although Garrett had given permission for filling the lot, DeMasi told Ireland on July 7, 2015, that DCH did not dump dirt on the site before closing because it was applying for grants. *Id.* at pp. 64-65 and Ex. 73, pp. 1-2. DeMasi stated that the hospital expected Garrett to de-rock, grade, and seed the entire site because it needed to look good in the interim. *Id.* Ireland notified Heitz of this, and also copied Heitz's son, Cory, with his email, because Heitz was on a bicycle at the time, somewhere in Canada. *Id.* at p. 6.

{¶ 74} On July 8, 2015, DCH and the Dayton Reserves signed an assignment and assumption agreement, pursuant to which DCH assigned its interest in the Contract to Purchase to Dayton Reserves, LLC ("Reserves"), which was a for-profit corporation previously set up to help CityWide with holding property for various reasons. Doc. #126,

Affidavit of Karen DeMasi, ¶ 5.   The agreement was in final form and both parties signed the agreement; the only thing missing was the notarization of the signatures of the Reserves' officers.   Doc. #132 (Corrected Ex. 95); DeMasi Deposition 1 at pp. 139-140.

{¶ 75} Subsequently, on July 10, 2015, DCH and Garrett signed a Fifth Amendment to the Contract.   Ex. 11, Fifth Amendment.   Heitz's son, Cory, was a member of Garrett and signed on Garrett's behalf.   Heitz Deposition at pp. 84-85.   This agreement was for an extension of the closing date to July 23, 2015.   *Id.* at Ex. 11.   At some point, DeMasi had realized that the Reserves could not give Garrett a charitable bargain sale because the Reserves was a for-profit company.   DeMasi Deposition 1 at p. 25.   As a result, DCH and the Port Authority entered into a development agreement and an assignment and assumption of the Contract to Purchase, pursuant to which DCH transferred all its rights, title, and interest in, to and under the contract to the Port Authority.   This occurred on July 23, 2015.   McGatha Deposition 1 at pp. 16-17, and 32; Feldman Deposition at pp. 95-97; Ex. 37; and Ex. 38.

{¶ 76} Under the development agreement, the Project would be deemed completed on the earliest occurrence of one of three conditions (The Completion Date). One of these conditions was when the CNS was obtained.   Ex. 37 at p. 4.   The Port Authority was then required to transfer all its interest to DCH no later than 30 days after the Completion Date.   The CNS was obtained on February 29, 2016.   McGatha Deposition 1 at pp. 42-47; Ex. 37 at p. 4; and Ex. 13.   However, the Port Authority did not transfer its interest before the complaint in this case was filed.   In fact, the transfer did not occur until July 27, 2017.   *See* Doc. #127, Second Affidavit of Edd McGatha.

{¶ 77} The closing on the Contract to Purchase took place on July 24, 2015.

DeMasi Affidavit at ¶ 10; McGatha Affidavit at ¶ 9. Because all the closing conditions had not been satisfied, CTC, Garrett and the Port Authority entered into an Escrow Agreement. McGatha Deposition 1 at pp. 129 and 131-132, and Ex. 12. Again, CTC, as escrow agent, was to retain $40,000 of the purchase price until Garrett satisfied the closing conditions that had not been met. Ex. 12 at p. 1. With all other deductions and credits, the amount of cash due to Garrett at settlement was $137,499.35. *Id.* at Ex. 12, Ex. B to Escrow Agreement (Closing Statement), p. 2. The conditions that had not been met were listed in Exhibit A, attached to the Escrow Agreement, and were as follows:

1. Complete remediation and clean-up of environmental conditions listed in the Phase I and Phase II environmental site assessments completed by the Seller for the Remediated Property and obtain a "Covenant Not to Sue" letter from the Ohio EPA as to the Remediated Property; and

2. De-rock, grade, and seed the Property.

Ex. A to Escrow Agreement; *see also* Feldman Deposition at p. 61; Heitz Deposition at p. 135.

{¶ 78} A few days after the closing, DeMasi contacted Ireland to ask when the de-rocking and grading of the Property would occur. Ireland Deposition at p. 65 and Ex. 74. DeMasi also emailed Cory Heitz, about this on July 31, 2015, but there is no indication of what the responses were to DeMasi's inquiry. *Id.* at p. 66 and Ex. 75. On August 12, 2015, DeMasi sent an email to Ireland, indicating that she had spoken to Scott Adams at the City of Dayton, and that there was nothing unusual about the City's request regarding the demolition at Electroplate. *Id.* at p. 67 and Ex. 76. DeMasi further stated that:

* * * It is routine to call for an inspection before the demolition site is filled in. It is a mystery why Bladecutters (who Garrett Day hired to complete the demo) did not follow this simple routine procedure.

Bottom line is there is not going to be a sign off on the demolition until someone digs up the site and proves the foundation was removed and the sewer lines were capped. * * * Without the sign off from the City, future use of the site is totally compromised. I had to relay this news to Dayton Children's and not surprisingly they are very unhappy.

Ireland Deposition at p. 67 and Ex. 76. Ireland forwarded this email to both Cory and Mike Heitz, stating "Please see below. We need to resolve this – thought we already dug the site for the City? *Id*.

{¶ 79} On September 10, 2015, Ireland sent an email to DeMasi, indicating they would have clarity on the de-rocking and reseeding soon. DeMasi Deposition 2 at p. 153 and Ex. 126. DeMasi then wrote the following email to Ireland on September 10, 2015:

* * * Since our discussion about de-rocking, I have done some investigation. Here is what I know to be true about the Electroplate site:

1. On October 6, 2014 Garrett-Day/Mike Heitz was informed by the City that they did not pass their rough demolition inspection.[21] The reason given was that the footers and foundations were still in the ground and the sewer lines were not properly capped. (Note: this was nine months before

---

[21] As previously noted, Heitz denied being aware of this. Given Ireland's email about Garrett having been punished by the City for covering the area where the slab had been removed, an inference might be drawn, however, that Heitz, in fact, knew about the October 6, 2014 visit to the site.

we closed)

2.   The City Building Inspector asked Bladecutters to meet then [sic] at the site a few weeks ago.   Bladecutters dug up a few holes which showed that the footers in fact were still there.   Using ground penetrating radar I have confirmed that there is still a lot of stuff in the ground.   I won't have the final report until next Wednesday that gives me total details on how much.[22]

3.   Mike Heitz met with the City's Chief Building Inspector while he was in town this weekend and claims that the former building inspector, Mike Cromartie gave him a variance which allowed him to leave the stuff in the ground.   However, the City has no copy of the variance.   This is odd, because if a variance had been granted why not produce it in October when the Building Inspector inquired about the demolition?   In addition, in the rare case when a variance is granted, it has to be signed off by an assistant city manager, in this case Shelley Dickstein.[23]   Since Shelley sits on the DaVinci investment board and is well aware of our work to acquire

---

[22] Again, this is contrary to the testimony of Scott and Adams, who said the digging occurred in April or May 2015, which would have been before the Third Amendment was signed.

[23] Both Heitz and Scott testified that the City did not always follow its requirements and did allow concrete in many instances to be left in the ground.   Heitz Deposition, p. 133 (noting that the City asked him to tear down a property adjacent to the Property, did not require a permit, and did not have an inspection; instead, the City just gave him a check) and p. 141; Scott Deposition at pp. 79-80. According to Scott, sometimes the City provided him with a written variance and sometimes they just let it go. Scott Deposition at p. 80.   In around 10% of the 200 to 220 demo jobs Scott did yearly for the City of Dayton, the Land Bank, or CityWide, he left some part of the foundation in the ground. Scott noted that he had only seen one written exception or variance.   *Id.* at pp. 81-82.

Electroplate, I think she would have told me if a variance had been granted.

4.   Mike Heitz also met with Mayor Whaley to tell her that Dayton

Children's was fine with him leaving footers, foundations, etc., in the ground.

Just so you are clear, they are not.

Ex. 126 at pp. 1-2.

{¶ 80} On October 8, 2015, Dickstein sent a letter to Heitz about several projects, including the Property.   Adams Deposition at p. 58 and Ex. 43.   The letter was prompted by Garrett's failure to complete the demolitions on these properties, and had been drafted by Scott Adams and his director, Ford Weber, who managed the City of Dayton's Economic Development Department.   Adams at pp. 58-59.   At some point before this letter went out, Heitz met with Ford and Adams to talk about demolition issues with these projects.   *Id.* at pp. 61-62.   At that time, Heitz stated that he was not going to do what was required with respect to the demolition ordinances.   *Id.* at p. 62.   The letter also referenced a meeting that Heitz had with Dayton Mayor, Nan Whaley.   *Id.* at Ex. 43.

{¶ 81} Heitz's position was that he did not need to do anything further about Dickstein's issues because he no longer owned the Property and there were no violations on the Property when the closing occurred.   In addition, Garrett was denied access to the Property.   Heitz Deposition at pp. 113, 139-140, and 177.   At some point in the fall of 2015, DCH had denied Heitz access to the Property.   McGatha Deposition 1 at pp. 133-135.

{¶ 82} In early November 2015, MAKSolve gave DCH an estimate for completing demolition and closing the demolition permit.   The amount of the proposal was $184,150. Kerr Deposition at p. 48 and Ex. 101.   The hospital made the decision to do additional

demolition based on the MAKSolve surveys. McGatha Deposition 1 at pp. 140-141. In response to a question about whether anyone asked for an exception to removal of all the concrete, McGatha stated that no one did anything to evaluate that possibility or went to the City to ask if DCH had to complete the demolition. *Id.* at pp. 141-142.

{¶ 83} Subsequently, on January 12, 2016, Garrett filed a mechanic's lien in the amount of $40,000 against the Property. Heitz Deposition at p. 154 and Ex. 17. Then, on February 29, 2016, the Ohio EPA issued the CNS for 1.4 acres of the Property. The CNS limited the Property to commercial or industrial land use. It also released Garrett and the Port Authority (and their successors or assigns) from all civil liability from the State to perform additional investigational and remedial activities. *See* Ex. 13 and Covenant Not to Sue, Director's Final Findings and Orders (February 29, 2016) at pp. 2 and 4, and Ex. 1 attached to the Director's Final Findings. The CNS was to "remain in effect for as long as the Property continues to comply with the applicable standards upon which the Covenant is based * * *." *Id.* at p. 5. The EPA also retained oversight and access to the Property at reasonable times. *Id.* at p. 6. According to Heitz, the Ohio EPA had inspected the monitoring wells at the Property a week before the CNS was issued. Heitz Deposition at pp. 92-94.

{¶ 84} On March 10, 2016, MAKSolve applied for a demolition permit for the Property, and a permit was issued on March 29, 2016. Adams Deposition at pp. 36-67 and Ex. 48. The City of Dayton gave final approval of the demolition in late August 2016. Adams at p. 12, Ex. 43, Bates Stamp DAYTON006. According to MAKSolve, the cost of the demolition was $323,848.03. Doc. #113, Kerr Affidavit, ¶ 6 and Ex. 2 to the affidavit p. 3.

**{¶ 85}** Garrett did not receive the signed 8283 charitable contribution form from the Port Authority by April 15, 2016. Feldman did not know why the Port Authority refused to sign this form (which was dated May 4, 2016) before the tax deadline. Feldman Deposition at p. 80 and Ex. 18.

**{¶ 86}** As noted, DCH and the Port Authority filed a complaint against Garrett, Heitz, and CTC on April 20, 2016 for breach of contract, fraud, and other claims. At the time, the Port Authority had not assigned its claims and rights under the contract to DCH. Doc. #127, Second McGatha Affidavit. In May 2016, CTC filed a motion for interpleader, asking the court to allow the escrow funds to be deposited with the court. The trial court granted the request on May 31, 2016, and dismissed CTC with prejudice. *See* Doc. #22.

**{¶ 87}** In June 2016, Defendants filed an answer, a counterclaim against Plaintiffs, a counterclaim against Feldman, and a third-party complaint for foreclosure. Feldman was added as a counterclaim defendant. The counterclaim contained the following claims: (1) breach of contract against DCH; (2) breach of escrow agreement against DCH and the Port Authority; (3) tortious interference of contract and business against DCH; (4) fraud against DCH and Feldman; and (5) foreclosure of the mechanic's lien against the Port Authority.

**{¶ 88}** In August 2016, Plaintiffs replied to the counterclaim. On the same day, they also filed a motion to dismiss the counterclaim or to render judgment on the pleadings on counts four and five of the counterclaim. After Defendants responded and also filed their own motion for judgment on the pleadings as to DCH's claim in count one and to both DCH's and the Port Authority's claims in counts two, three, four, and five, the trial

court overruled both motions.[24]   However, in April 2017, the Port Authority dismissed the following claims against Garrett, without prejudice: fraud, negligent misrepresentation, unjust enrichment, and promissory estoppel.   *See* Doc. #86.

**{¶ 89}** Subsequently, both sides filed motions for summary judgment in July 2018. After considering the issues and the material submitted, the trial court sustained DCH's and Feldman's motion for summary judgment as to Defendants' fraud claim (count four of the counterclaim).   The court also sustained Defendants' summary judgment motion as to the fraud and negligent misrepresentation claims in Plaintiffs' complaint (counts two and three).   In all other respects, the summary judgment motions were denied.   The trial court included a Civ.R. 54(B) certification for purposes of allowing an interlocutory appeal.

**{¶ 90}** We concluded that the judgment was a final appealable order, but limited our consideration to the parts of the decision that were final and appealable under Civ.R. 54(B) – the dismissal of Plaintiffs' fraud and negligent misrepresentation claims and the dismissal of Defendants' fraud counterclaims.   *See Dayton Children's Hosp. v. Garrett Day LLC*, 2018-Ohio-5466, 131 N.E.3d 304, ¶ 20 (2d Dist.).   Defendants appealed from our decision to the Supreme Court of Ohio, and we stayed the appeal pending a decision from that court.   On April 17, 2019, the Supreme Court of Ohio declined to accept the appeal.   *See Dayton Children's Hosp. v. Garrett Day, L.L.C.,* 155 Ohio St.3d 1421, 2019-

---

[24] On December 2, 2016, while the lawsuit was pending, the Ohio EPA conducted a walk-through of the Property and found that one monitoring well was neither present nor intact, and another monitoring well was in disrepair.   McGatha Deposition, p. 152 and Ex. 39. The EPA sent Garrett a notice of violation ("NOV") but then rescinded it because Garrett was not the owner.   McGatha Deposition at p. 152-153 and Exs. 39 and 40.   The EPA then sent the NOV to the Port Authority.   The violations could cause the loss of the CNS on the Property.   Heitz Deposition at p. 91.

Ohio-1421, 120 N.E.3d 867.   Accordingly, for purposes of review, we will consider only those matters outlined in our decision.   We begin with Plaintiff's sole cross-assignment of error, which we consider out of order.

## II.   Summary Judgment on DCH's Fraudulent Inducement Claim

**{¶ 91}** Plaintiffs' cross-assignment of error states that:

> The Trial Court Erred by Granting Summary Judgment to Garrett Day
>
> and Heitz on Children's Fraudulent Inducement Claim.

**{¶ 92}** Under this cross-assignment of error, DCH argues only that the trial court erred in granting summary judgment on grounds other than those raised by Defendants. *See* Plaintiffs' First Response Brief, pp. 19-20 and Reply Brief of Plaintiffs, pp. 7-8.[25] DCH does not assert error regarding the summary judgment granted to Defendants on DCH's negligent misrepresentation claim.

**{¶ 93}** In its decision, the trial court noted that DCH did not file for summary judgment on its fraud claim.   Doc. #172, p. 10.   In beginning its analysis of Defendant's motion for summary judgment on that claim, the trial court described the basis of DCH's fraud claim, as follows:

> DCH averred that prior to entering into the contract, Defendants falsely
>
> represented that they would remove all "concrete slab" at the property.
>
> *Compl.* at ¶¶ 34-35.   DCH asserted that Defendants falsely represented

---

[25] In its Reply Brief, DCH responded to arguments that Defendants made about the application of the parol evidence rule to bar evidence of fraudulent intent.   However, the trial court did not premise its decision on that rule.   We also note that DCH is the only party advancing this cross-assignment of error.   The Port Authority dismissed its fraud claim, and Feldman did not make any fraud claims against Defendants.

that it [sic] had removed all of the concrete-related materials, and they also "failed to disclose that they had not complied with the City of Dayton permit requirements for demolition and removal of concrete at the Property * * * ." *Id.* at ¶¶35-36. DCH further asserted that Defendants had a duty to disclose "the concrete-related materials and permit and other legal issues * * * ." *Id.* at ¶ 40.

Doc. 172 at pp. 10-11.

**{¶ 94}** The trial court also observed that Defendants did file for summary judgment on the fraud claim of DCH. *Id.* at p. 11. The court then summarized various arguments that Defendants made, including that "DCH failed to cite to any representation or concealment that exists independent of the contract." *Id.*, citing Defendant's Summary Judgment Motion at p. 8. After considering the arguments, the trial court concluded that summary judgment should be granted to Defendants for these reasons: (1) DCH's fraud claim duplicated its breach of contract claim and was not viable; (2) DCH failed to show that Defendants "owed a duty separate and apart from their contractual duties"; and (3) DCH did not allege any extra-contractual damages. *Id.* at pp. 13-14.

**{¶ 95}** In reviewing decisions granting summary judgment, we apply a de novo standard, "which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to

the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**{¶ 96}** Under established law, parties seeking summary judgment must "disclose the basis for the motion and support the motion with evidence," and they have " '[t]he burden of showing that no genuine issue exists as to any material fact * * *.' " *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988), quoting *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978). (Other citation omitted.) Thus, "the moving party must state specifically which areas of the opponent's claim raise no genuine issue of material fact and such assertion may be supported by affidavits or otherwise as allowed by Civ.R. 56(C)." *Id.*

**{¶ 97}** However, as the court stressed in *Mitseff*, this "does not mean the non-moving party bears no burden. Requiring that the moving party provide specific reasons and evidence gives rise to a reciprocal burden of specificity for the non-moving party. Civ.R. 56(E) provides in part: 'When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.' Rather than eliminate the non-moving party's burden, the requirement that the moving party * * * be specific in his reasons for requesting summary judgment provides the non-moving party with the information needed to formulate an appropriate response as required by Civ.R. 56(E)." *Id.*

**{¶ 98}** After reviewing the record and the trial court's decision, we find no error.

Contrary to DCH's claim, Defendants adequately raised the issues upon which the trial court granted summary judgment. In their motion for summary judgment, Defendants initially raised seven points, including matters such as the fact that the contract was an "as is" contract and Defendants had no duty to disclose latent defects; and the fact that there was no duty to remove or disclose any information about underlying materials because the contract called for removal of only the concrete slab. Doc. #115, Joint Motion for Summary Judgment, p. 7. However, Defendants went on to note, as the trial court indicated, that "[n]either DCH or the Port [Authority] can cite to a representation or concealment related to a non-contractual obligation as the basis for a fraud claim." *Id.* at p. 8.

{¶ 99} In addition, when discussing the fraud claims against Heitz individually, Defendants stated that "[a]ny alleged fraudulent statements made by Heitz prior to forming the Contract are precluded by the fully integrated Contract itself, and such claims fail as a matter of law." *Id.* Defendants also discussed these issues, citing to pertinent authority. *Id.* at pp. 8-9.

{¶ 100} Thus, DCH was not surprised about the basis for summary judgment and had an adequate chance to respond. In fact, in Plaintiffs' memorandum in opposition to Defendants' motion for summary judgment, Plaintiffs spent a substantial amount of time discussing the fraud claims asserted by both sides. *See* Doc. #130, Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, pp. 36-44. In particular, Plaintiffs discussed the fact that a fraud claim cannot exist when an explicit written contract exists; they also argued that Defendants' fraud claim was precluded by the integration clause in the contract. *Id.* at pp. 38-39.

{¶ 101} Accordingly, we find no merit in Plaintiff's assertion that the basis for summary judgment was not adequately raised, and that they did not have an opportunity to adequately respond.

{¶ 102} Assuming that DCH had also challenged the merits of the summary judgment decision, we find no error in this regard, either. In essence, DCH contends that Garrett fraudulently induced it to enter into the Contract to Purchase and Third Amendment by promising to remove all the concrete below and above the ground and to produce a "shovel ready site" that DCH could use for development. As an initial point, neither of these explicit obligations is in the contract. Instead, Garrett agreed to "[r]emove concrete slab" and warranted that "there is no violation or alleged violation of any legal requirement affecting the Property, including, without limitation, any violation or alleged violation of any zoning, subdivision, fire, safety, health, accessibility, environmental or other codes, laws, ordinances, statutes, regulations, rules or orders of any city, county, state and/or federal authorities with jurisdiction in these matters." Ex. 11 (Contract to Purchase), "Seller's Representations" at p. 2, ¶ 8; Addendum at p. 5, ¶ 10.[26]

{¶ 103} Although evidence of negotiations and agreements outside the execution

---

[26] McGatha claimed in an affidavit that before DCH entered into the Contract and the Third Amendment, Garrett and Heitz "represented they were going to remove all the concrete and any material at the property including all concrete below the surface of the property." Doc. #112, McGatha Affidavit at ¶ 5. The trial court overruled a motion to strike this paragraph, finding that it was not inconsistent with prior deposition testimony. Doc. #161, p. 6. Having read the record, we disagree. McGatha's deposition testimony did not indicate that any such consistent statements were made. Furthermore, as noted in the main text, there were differing opinions of the meaning of "shovel ready." What is clear is that the parties did not communicate well, nor did they carefully word their agreements.

of a written contract are normally excluded due to the parol evidence rule, this rule "does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27-28, 734 N.E.2d 782 (2000). "A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. * * * In order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502, 692 N.E.2d 574 (1998). Generally, "fraud cannot be predicated upon promises or representations relating to future actions or conduct." *Tibbs v. Natl. Homes Constr. Corp.*, 52 Ohio App.2d 281, 286, 369 N.E.2d 1218 (1st Dist.1977).

**{¶ 104}** "Fraudulent inducement must be proven by clear and convincing evidence." *Simon Property Group, L.P. v. Kill*, 3d Dist. Allen No. 1-09-30, 2010-Ohio-1492, ¶ 17, citing *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 2002-Ohio- 2427, 768 N.E.2d 619, ¶ 62. The Supreme Court of Ohio has also stressed that " 'a fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract. Quite to the contrary, attempts to prove such contradictory assertions [are] exactly what the Parol Evidence Rule was designed to prohibit.' " (Citation omitted.) *Galmish*, 90 Ohio St.3d at 29, 734 N.E.2d 782.

**{¶ 105}** In its decision, the trial court did not reject evidence or the claims based on the parol evidence rule. Instead, the court concluded that DCH's claim for fraud duplicated its contract claim and was not viable. Doc. #172 at p. 13. We agree.

**{¶ 106}** The case the trial court primarily relied on was *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261 (9th Dist.1996). *See* Doc. #172 at pp. 12-14. In *Textron*, the court of appeals held that failing to obtain a lessor's consent for a computer upgrade, "as fraudulent conduct, could not be separated from the conduct as breach of the parties' master lease." *Id.* at 151. In discussing this holding, the court noted that "[i]n Ohio, a breach of contract does not create a tort claim," and that in general, " 'the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim.' " *Id.*, quoting *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir.1981).

**{¶ 107}** The court of appeals further observed that "[a] tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Id.*, citing *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 117 (6th Cir.1976). Our district has agreed with this position. *See Argrov Box Co. v. Illini Four Co.*, 2d Dist. Montgomery No. CA-6947, 1981 WL 2827, *4 (June 15, 1981); *Kane v. Mazer Corp.*, 2d Dist. Montgomery No. 11614, 1990 WL 74021, *1-2 (May 29, 1990); *Duncan v. Fifth Third Bank*, 2d Dist. Greene No. 2018-CA-50, 2019-Ohio-3198, ¶ 22. In the case before us, DCH has not pointed to an independent duty that Garrett owed even if the contract did not exist.

**{¶ 108}** Notably, a breaching party's motive is irrelevant in a contract action. *Textron* at 151, citing *Wolfe* at 710. *Accord Twin Maples Veterinary Hosp. v. Cincinnati Ins. Co.*, 159 Ohio App.3d 590, 2005-Ohio-430, 824 N.E.2d 1027, ¶ 24 (2d Dist.). Thus,

in *Textron*, the court found that the "[t]he additional allegation of an *intentional* failure to obtain Textron's consent to the upgrade by claiming concealment does not change the contractual nature of Textron's claim." (Emphasis sic.) *Textron* at 151.

{¶ 109} In the case before us, even though the parties renegotiated several times, the obligation to "[r]emove concrete slab" remained constant.[27] The Third Amendment (like the other amendments) specifically noted that in all respects other than the agreed changes, the Contract to Purchase "is hereby ratified and affirmed and shall remain in full force and effect." Ex. 11, Third Amendment at p. 3. As in *Textron*, the fraud claim and alleged breach both relate to the contract, i.e., that Garrett did not remove all the concrete as required and did not comply with the City's demolition ordinances, which the contract may also have required (although in an unspecific and indirect manner). The trial court made specific mention of the fact that the claims were identical, by comparing the misrepresentations cited in DCH's motion for summary judgment and the allegations of DCH's contract claim. Doc. #172 at p. 13. Having done so, the court concluded that the claims were factually intertwined and could not be separated. *Id.*

{¶ 110} Furthermore, the fraud claim was also not viable because Garrett had already warranted in the Contract to Purchase that all information disclosed during due diligence was "accurate, complete, not misleading." Ex. 11, Addendum, at p. 4, ¶ 6. The contract did not specify a time limit for due diligence for anything other than title work; as a result, any alleged misleading information received up to the time of closing would

---

[27] The trial court found the use of "concrete slab" ambiguous. Doc. #172 at p. 6. There was evidence of the accepted meaning of "slab," "footers," and "foundation" in the construction industry, and that these terms do not mean the same thing. *See* Adams Deposition at pp. 83-85. We express no opinion on this point, as it is not central to our decision.

have been included in the contractual obligations, and is, therefore, subsumed within the claim for breach of contract.

{¶ 111} As an additional ground, the trial court rejected the tort claim because DCH failed to claim damages independent of those that arose from the breach of contract. Doc. #172 at p. 14, citing *Kott v. Gleneagles Professional Builders & Remodelers, Inc.*, 197 Ohio App.3d 699, 2012-Ohio-287, 968 N.E.2d 593, ¶ 15 (6th Dist.) and *Med. Billing, Inc. v. Med. Mgmt. Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir.2000). Again, we agree with the trial court. Our review of the record failed to disclose any damages that DCH claimed, other than those attributed to the removal of the remaining concrete by MAKSolve. DCH has not disputed this point.

{¶ 112} Based on the preceding discussion, Plaintiffs' sole cross-assignment of error is overruled.

IV. Defendants' Claim for Fraudulent Inducement

{¶ 113} Defendants' sole assignment of error states that:

The Trial Court Erred in Granting Summary Judgment to DCH and Feldman on Garrett and Heitz's Fraudulent Inducement Claim.

{¶ 114} In count four of the counterclaim, Defendants alleged that they had been damaged by DCH's false representations in an amount in excess of $25,000. This claim is based on allegations that during negotiations for the Third Amendment, DCH and Feldman falsely represented that if Garrett agreed to reduce its purchase price to $200,000, DCH would execute all documents that Garrett reasonably needed to treat part of the sale proceeds as a charitable donation for tax purposes. Garrett also alleged that

DCH and Feldman discussed holding part of the sales proceeds in escrow and that they would not deny Garrett access to the Property. According to the counterclaim, DCH prevented Garrett from accessing the Property after the closing. Doc. #29, pp. 20-22 and 24. Forms for the charitable donation were also not signed in time for the 2015 tax year.

{¶ 115} As with DCH's fraud claim, the trial court concluded that Defendants' fraud claims were duplicative of their claims for breach of the contract and breach of the escrow agreement, and were factually intertwined with the contract claims. The court further held that Defendants' claimed damages were the same as those alleged for breach of contract.

{¶ 116} According to Defendants, the trial court misapplied the merger and parol evidence rules because fraud cannot be merged into a contract when the alleged fraudulent inducement is consistent with the written terms of the contract. As noted, the trial court did not rely on the parol evidence rule.

{¶ 117} Defendants further argue that a promise pertaining to future conduct can be the basis for fraudulent inducement if the promisor did not intend to keep its promise when the promise was made. In this vein, Defendants contend that the trial court erred by failing to examine and discuss any evidence indicating whether DCH and Feldman intended to keep their promises when the Third Amendment was signed. Following this discussion, Defendants point to evidence they believe shows that DCH and Feldman did not intend to keep their promises.

{¶ 118} In its decision, the trial court stated as follows:

> The Court further agrees with Plaintiffs and Ms. Feldman that the

allegation in paragraph four of Defendants' *Counterclaim,* i.e., that Ms. Feldman and DCH represented that DCH would not deny Garrett Day access to the property to complete the escrow tasks, is a promise relating to future conduct that cannot serve as a basis for fraudulent inducement unless it is demonstrated that DCH and/or Ms. Feldman had no intention of keeping its promise at the time the promise was made.

(Emphasis sic.)   Doc. #172 at p. 30.

**{¶ 119}** This was not the only basis for the court's decision, however.   As noted, the court had several reasons for granting summary judgment in favor of DCH on this claim.   Furthermore, in rejecting the fraudulent inducement claims of both DCH and Defendants, the trial court cited case law regarding the lack of viability of tort claims where the tort and contract claims are intertwined.   *See* Doc. #172 at pp. 13 and 31, citing *Thornton v. Cangialosi,* S.D.Ohio No. 2:09-CV-585, 2010 WL 2162905, *3 (May 26, 2010).   Not only is *Thornton* instructive in that respect, but the federal court (applying Ohio law) also discussed the exception that Defendants have raised.   Specifically, the court stated that:

As a general rule, a fraud claim "cannot be predicated upon promises or representations relating to future actions or conduct."   *Tibbs v. National Homes Constr. Corp.*, 52 Ohio App.2d 281, 286, 369 N.E.2d 1218, 1222 (Ohio Ct.App.1977).   However, an exception exists "where an individual makes a promise concerning a future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise."   *Williams v. Edwards*, 129 Ohio App.3d 116, 124, 717 N.E.2d 368, 374 (Ohio

Ct.App.1998).

*Id.* at *3.

**{¶ 120}** The court noted that the plaintiffs in that case had alleged that the defendant made certain misrepresentations when the contract was signed that they had relied on (such as his promise to buy back their stock and that he had sufficient net worth to do so), but had no intention of keeping those promises when the contract was signed. *Id.* However, the court concluded that this was "not the relevant question." *Id.* Instead, "[t]he question [was] whether such a claim is viable in light of the concurrent breach of contract claim." *Id.* The court then commented that:

As noted above, an independent tort claim is viable only if Plaintiffs can show that Cangialosi owed a duty separate and distinct from his contractual duties. As the Supreme Court of Ohio noted in *ABM Farms*, a claim of fraudulent inducement typically involves "a misrepresentation of facts *outside* the contract or other wrongful conduct [inducing] a party to enter into the contract. Examples include a party to a release misrepresenting the economic value of the released claim, or one party employing coercion or duress to cause the other party to sign an agreement." 81 Ohio St.3d at 503, 692 N.E.2d at 578 (emphasis added). In other words, the claim involves some collateral misrepresentation designed to induce the plaintiff to enter into the contract. *See also Wall v. Planet Ford, Inc.*, 159 Ohio App.3d 840, 850-51, 825 N.E.2d 686, 694 (Ohio Ct.App.2005) (giving an example of a termite inspector falsely representing that a house is infested with termites in order to induce the homeowner to

enter into a pest control contract).

Id. at *3

{¶ 121} After making these remarks, the federal court noted that the plaintiffs had failed to show that the defendant made any misrepresentations that were collateral to the contract. Because they failed to do so, the court stated that the defendant's lack of intention to keep promises at the contract's outset could not save their fraudulent inducement claim. Id. at *4.

{¶ 122} The situation here is similar. All the alleged statements of Feldman or DCH did not relate to collateral misrepresentations; they related to contractual duties, With regard to de-rocking and reseeding, the Port Authority (to whom DCH had assigned its rights and duties) agreed to "take any and all actions reasonably necessary to cause the satisfaction of the Closing Conditions in a timely manner * * * ". See Ex. 12 at p. 2, ¶ 3. And, concerning the signing of the tax form, that was nothing more than a contractual promise made in the Third Amendment. See Ex. 11, Third Amendment at p. 2, ¶ 2.

{¶ 123} The same observations are obviously true with respect to DCH's claim against Defendants (which we have already addressed). The actions that DCH points to as fraudulent inducement are not collateral to the Contract to Purchase.

{¶ 124} Having reviewed the record, there is simply no evidence that Defendants' claims are anything other than ones for breach of the Contract to Purchase and the Escrow Agreement. As we previously observed, a tort claim is not viable in the absence of an independent duty outside the contract or where the tort damages are the same as would lie for breach of contract. The case before us simply involves a situation where

two parties contracted, and due to various factors, including poor communication and poor phrasing, their expectations were not met.

**{¶ 125}** In view of the above discussion, the trial court did not err in granting summary judgment to DCH on the fraudulent inducement claims asserted by Defendants. Accordingly, Defendants' sole assignment of error is overruled.

**{¶ 126}** As a final matter, we note that in a footnote, Defendants complain that they never received a copy of our December 12, 2018 decision limiting the briefs to the claims on which summary judgment was granted, nor did they receive a copy of our August 16, 2018 show cause order requiring the parties to answer whether the trial court's order was so limited. *See* Defendants' Brief, p. 2, fn. 1. According to Defendants, the clerk is required under App.R. 30(A) to immediately serve all parties with notice of the entry of an order or judgment and to make a note in the docket of the mailing. Defendants, therefore, ask that we direct the clerk to serve copies of all orders on the parties and note the mailing in the docket.

**{¶ 127}** This issue relates to events that occurred a year ago, and our review of the docket indicates that Defendants were in no way prejudiced, as they did respond to our show cause order and did appeal to the Supreme Court of Ohio. More importantly, if Defendants are concerned with the clerk's implementation of the rule, they should address that with the clerk. App.R. 30 is titled "Duties of Clerks."

**{¶ 128}** Finally, under well-established authority, parties are responsible for checking the docket and keeping themselves informed of the progress of their cases. *E.g., Pearl v. J&W Roofing & Gen. Contracting*, 2d Dist. Montgomery No. 16045, 1997 WL 86415, *1 (Feb. 28, 1997); *Bank of Am., N.A. v. Shultz*, 2d Dist. Clark No. 2012-CA-

70, 2013-Ohio-2567, ¶ 14, fn. 4.   As a result, we decline Defendants' request.


V.   Conclusion

**{¶ 129}** Defendants' sole assignment of error and Plaintiffs' sole cross-assignment of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .


HALL, J. and TUCKER, J., concur.


Copies sent to:

Jeffrey P. McSherry
Bryan M. Smeenk
Paul T. Saba
Jeffrey M. Nye
Hon. Mary E. Montgomery